IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

Holding a Criminal Term
Grand Jury Sworn in on April 29, 2005

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | : | CRIMINAL NO. |
| | : | |
| v. | : | GRAND JURY ORIGINAL |
| | : | |
| MOJTADA MALEKI-GOMI, | : | VIOLATIONS: |
| also known as Moji Maleki, | : | |
| BABAK MALEKI, | : | 18 U.S.C. § 371 |
| also known as Bobby Maleki, | : | (Conspiracy) |
| SHAHRAM SETUDEH NEJAD, | : | |
| also known as Shawn Nejad, | : | 50 U.S.C. § 1705 |
| | : | (International Emergency Economic |
| Defendants. | : | Powers Act) |
| | : | |
| | : | 31 C.F.R. Part 560 |
| | : | (Iranian Transactions Regulations) |
| | : | |
| | : | 18 U.S.C. § 2 |
| | : | (Aiding and Abetting) |
| | : | |
| | : | 28 U.S.C. § 2461(c) & |
| | : | 18 U.S.C. § 981(a)(1)(C) |
| | : | (Criminal Forfeiture) |

**I N D I C T M E N T**

The Grand Jury charges that:

**COUNT ONE**

At times material to this Indictment:

**INTRODUCTION**

1.   Defendants **MOJTADA MALEKI-GOMI** and **BABAK MALEKI** did business

as M&M Investment Co.  M&M Investment Co. was located at 260 South Beverly Drive,

Beverly Hills, California, 90212. M&M Investment Co. sold and exported textile equipment and other commodities.

2. Defendant **SHAHRAM SETUDEH NEJAD** worked for M&M Investment Co. in coordinating and facilitating sales and exports.

3. Knit-de-Knit ("KDK") machinery is a type of equipment that is used in the manufacture of textiles. M&M Investment Co. sold KDK machinery, among other products.

<u>International Emergency Economic Powers Act (IEEPA)</u>

4. The International Emergency Economic Powers Act ("IEEPA"), 50 U.S.C. §§ 1701-1706, authorized the President of the United States to impose economic sanctions against a foreign country in response to an unusual or extraordinary threat to the national security, foreign policy, or economy of the United States when the President declares a national emergency with respect to that threat.

5. On March 15, 1995, the President issued Executive Order No. 12957 finding that "the actions and policies of the Government of Iran constitute an unusual and extraordinary threat to the national security, foreign policy, and economy of the United States" and declaring "a national emergency to deal with that threat." Executive Order No. 12957, as expanded and continued by Executive Orders No. 12959 and 13059 and successive Presidential notices, was in effect at all times relevant to this Indictment.

6. Executive Orders No. 12959 and 13059 (the "Executive Orders") imposed economic sanctions, including a trade embargo, on Iran. The Executive Orders prohibited, among other things, the exportation, re-exportation, sale, or supply, directly or indirectly, to Iran of any goods, technology, or services from the United States or by a United States person. The

Executive Orders also prohibited any transaction by any United States person or within the United States that evaded or avoided, or had the purpose of evading or avoiding, any prohibition set forth in the Executive Orders.

The Iranian Transactions Regulations

7. The Executive Orders authorized the Secretary of the Treasury, in consultation with the Secretary of State, "to take such actions, including the promulgation of rules and regulations, as may be necessary to carry out the purposes" of the Executive Orders.  Pursuant to this authority, the Secretary of the Treasury promulgated the Iranian Transactions Regulations ("ITR"), 31 C.F.R. Part 560, implementing the sanctions imposed by the Executive Orders.

8. Under the Iranian Transactions Regulations, 31 C.F.R. Part 560:

   a. Section 560.204 provided that no goods, technology, or services may be exported, re-exported, sold, or supplied to Iran, directly or indirectly, from the United States or by a United States person wherever located, without authorization.  31 C.F.R. 560.204

   b. Section 560.203 prohibited any transaction by any United States person or within the United States that evaded or avoided, or had the purpose of evading or avoiding, or that attempted to violate, any of the prohibitions set forth in Part 560.  Section 560.203 further prohibited any attempt to violate the prohibitions contained in Part 560.  31 C.F.R. § 560.203.

9. The United States Department of the Treasury's Office of Foreign Assets Control ("OFAC"), located in the District of Columbia, had responsibility for administering the ITR and was the entity empowered to authorize transactions with Iran during the embargo.  Such

authorization, if granted, would be in the form of a license.

## THE CONSPIRACY

10.     Beginning in or around July 2005 and continuing through in or around July 2006, within the District of Columbia and elsewhere, the defendants, **MOJTADA MALEKI-GOMI, BABAK MALEKI**, and **SHAHRAM SETUDEH NEJAD**, and others known and unknown to the Grand Jury, knowingly combined, conspired, confederated, and agreed with each other to commit an offense against the United States, to wit, to violate willfully IEEPA and the ITR by exporting and attempting to export U.S. origin commodities to Iran without having first obtained the required authorizations from OFAC, located in the District of Columbia.

## OBJECTS OF THE CONSPIRACY

11.     The objects of the conspiracy were:

    a.     to earn money by exporting textile equipment and other commodities from the United States to the country of Iran;

    b.     to evade the prohibitions and licensing requirements of IEEPA and the ITR; and

    c.     to conceal the prohibited activities and transactions from detection by the United States government so as to avoid penalties and disruption of the illegal activity.

## MANNER AND MEANS OF THE CONSPIRACY

12.     The conspirators would and did use the following manner and means, among others, to accomplish the objects of the conspiracy:

    a.     M&M Investment Co. advertised commodities, including KDK

       machinery, on websites on the internet. Defendant **SHAHRAM SETUDEH NEJAD** responded on behalf of M&M Investment Co. to inquiries about purchasing the advertised commodities.

b.    M&M Investment Co. shipped the commodities it was selling to any location the purchaser designated, including to Iran.

c.    In order to prevent detection of unlawful exports to Iran, defendants **MOJTADA MALEKI-GOMI** and **BABAK MALEKI** caused a shipping company in the United States to designate falsely on shipping and export documents a business in Dubai, United Arab Emirates, as the ultimate consignee of the shipments to Iran. Upon arrival of the shipment in Dubai, **MOJTADA MALEKI-GOMI** and **BABAK MALEKI** caused the consignee in Dubai to immediately re-export the commodity to Iran.

d.    When U.S. Customs and Border Protection ("CBP") seized or detained a shipment of commodities from M&M Investment Co. and questioned whether the true destination of the export was Iran, **BABAK MALEKI** and **SHAHRAM SETUDEH NEJAD** falsely represented that the shipment was destined for a customer in Dubai, United Arab Emirates, and that the commodities were to remain in Dubai and not be re-exported to Iran.

e.    Neither defendants **MOJTADA MALEKI-GOMI, BABAK MALEKI**, and **SHAHRAM SETUDEH NEJAD** nor their co-conspirators obtained the required licenses from OFAC, located in the District of Columbia, for

any exports to Iran.

**OVERT ACTS**

13.     In furtherance of this conspiracy, the defendants, **MOJTADA MALEKI-GOMI, BABAK MALEKI, SHAHRAM SETUDEH NEJAD**, and other conspirators committed overt acts, including but not limited to the following:

(1)     On or about July 19, 2005, defendant **SHAHRAM SETUDEH NEJAD**, in a telephone conversation with a Cooperating Source ("CS") and knowing that the CS was seeking to acquire KDK machinery for export to Iran, told the CS that he would obtain pricing information for the KDK machinery from defendant **BABAK MALEKI**.

(2)     On or about August 4, 2005, defendant **SHAHRAM SETUDEH NEJAD** showed the KDK machinery that was the subject of the conversation described in Overt Act 1 to the CS and to an Undercover Agent ("UCA") at a warehouse in Los Angeles, California.  During the visit of the CS and the UCA to the warehouse, defendant **SHAHRAM SETUDEH NEJAD** falsely identified himself as "John."

(3)     On or about August 4, 2005, after the CS and UCA viewed the KDK machinery at the Los Angeles warehouse, defendant **SHAHRAM SETUDEH NEJAD** had a telephone conversation with the UCA in which he discussed with the UCA the price for the KDK machinery and the cost of shipping the machinery to Iran, saying, "$7,000 will cost to deliver it to Tehran, more or less."

(4)     On or about August 24, 2005, defendant **MOJTADA MALEKI-GOMI** had a telephone conversation with the UCA in which he discussed with the UCA the cost of the KDK machinery and the necessity, in order to avoid detection by the United States government,

of shipping the machinery to Iran through Dubai, United Arab Emirates, with the paperwork showing a company in Dubai as the purchaser of the equipment.

(5) On or about September 8, 2005, defendant **SHAHRAM SETUDEH NEJAD** sent an e-mail message to the UCA, forwarding to the UCA the purchase order for the sale of 30 KDK machines for $21,000 and with a shipping cost of $7,000. The purchase order falsely listed the vendor as "AEC L.L.C., P.O. Box 116490, Dubai - United Arab Emirates" and the consignee as "AEC L.L.C., P.O. Box 116490, Dubai - United Arab Emirates." The purchase order also falsely stated that the shipping cost was for "shipment to U.A.E."

(6) On or about September 14, 2005, defendant **MOJTADA MALEKI-GOMI** had a telephone conversation with the UCA in which he discussed the length of time it would take to ship the KDK machinery to Iran.

(7) On or about September 19, 2005, defendant **MOJTADA MALEKI-GOMI** sent the UCA an e-mail advising the UCA that he should wire payment for the KDK machinery to an M&M Investment Co. account at the Union Bank of California, Account No. 0360003264.

(8) On or about September 21, 2005, defendant **MOJTADA MALEKI-GOMI** and the UCA met in Los Angeles, California, during which defendant **MOJTADA MALEKI-GOMI** discussed his experience doing business in Iran and his ability to arrange for the shipment of commodities from the United States to Iran through Dubai, United Arab Emirates.

(9) On or about October 3, 2005, M&M Investment Co. received a wire transfer in the amount of $2,800 into Account No. 0360003264 as a down payment from the

UCA for the purchase and shipment to Iran of 30 KDK machines.

(10) On or about November 18, 2005, defendant **SHAHRAM SETUDEH NEJAD** had a telephone conversation with the UCA in which he explained to the UCA that there had been a delay in loading the KDK machinery into a container and shipping it to Iran through Dubai because they were "selling this stuff to certain destinations that are not legal. So basically there are a few companies who handle these kind of things."

(11) On or about December 5, 2005, defendant **SHAHRAM SETUDEH NEJAD** sent an e-mail to the UCA advising the UCA that the shipping company had loaded the KDK machinery into a container and had taken the container to load on a ship. Defendant **SHAHRAM SETUDEH NEJAD** also attached to the e-mail message the bill of lading that the shipping company had prepared.

(12) On or about December 7, 2005, defendants **MOJTADA MALEKI-GOMI**, **BABAK MALEKI**, and **SHAHRAM SETUDEH NEJAD** exported 28 KDK machines to Dubai, United Arab Emirates, for re-export to Iran. At no time did any of the defendants or their co-conspirators obtain a license from OFAC in the District of Columbia before exporting the KDK machinery to Iran.

(13) On or about December 13, 2005, defendant **BABAK MALEKI** met with the UCA in Los Angeles, California, and accepted a cashier's check in the amount of $25,200, which represented the outstanding balance for the purchase of the 30 KDK machines.

(14) On or about December 13, 2005, during the meeting described in Over Act 13, defendant **BABAK MALEKI** indicated to the UCA that he and his co-conspirators would be interested in assisting the UCA in making additional unlawful exports.

(15)    On or about December 13, 2005, during the meeting described in Overt Act 13, defendant **BABAK MALEKI** described to the UCA how the process of transshipping the KDK machinery to Iran through Dubai worked by "just chang[ing] the paperwork," and he warned the UCA not to disclose to any representatives of the shipping company in the United States that Iran was the final destination of the shipment, saying, "Whatever you do, don't tell any of these guys where it's going . . .  No, never, because they all think it's going to Dubai."

(16)    On or about December 16, 2005, defendants **MOJTADA MALEKI-GOMI** and **BABAK MALEKI** caused the cashier's check in the amount of $25,200 that **BABAK MALEKI** received from the UCA to be deposited in an M&M Investment Co. account at the Union Bank of California, Account No. 0360003264.

(17)    On or about January 4, 2006, after CBP ordered that the container with the 28 KDK machines be returned to the United States and then be detained, defendant **BABAK MALEKI** had a telephone conversation with a CBP Officer in which he falsely claimed that the United Arab Emirates was the final destination of the container and he falsely denied that the container would be transshipped to another country from the United Arab Emirates.

(18)    On or about January 19, 2006, defendant **MOJTADA MALEKI-GOMI** met with the UCA in Los Angeles, California, and, because of concerns that United States authorities were monitoring his activities, cautioned the UCA about talking on the telephone about transactions involving Iran.  During the conversation, defendant **MOJTADA MALEKI-GOMI** also falsely assured the UCA that the container with the 28 KDK machines was in route to Iran, even though CBP already had detained it.

(19)    On or about July 18, 2006, defendant **BABAK MALEKI**, in a telephone

conversation with an undercover agent ("UCA-2") and a CBP Officer concerning the detained container of 28 KDK machines, falsely represented that the KDK machinery was for a customer in Dubai, United Arab Emirates, that the purchaser of the machinery was a company in Dubai called AES, and that M&M Investment Co. would not export commodities from the United States to Iran.

(20)    On or about July 18, 2006, in a meeting in Long Beach, California, with UCA-2 and a CBP Officer concerning the detained container of 28 KDK machines, defendant **SHAHRAM SETUDEH NEJAD** falsely represented that M&M and "the Malekis" were the owners of the 28 KDK machines and that "[t]o the best of [his] understanding" the ultimate destination of the machines was Dubai.

(21)    On or about July 27, 2006, defendants **BABAK MALEKI** and **SHAHRAM SETUDEH NEJAD** sent a letter to CBP in Long Beach, California, falsely claiming that the purchaser of the 28 KDK machines was "AEC Electronic LLC, P.O. Box 115490, 310-3, Third Floor, Khaleej Center, Bur Dubai, U.A.E."

(**Conspiracy to Commit an Offense Against the United States**, in violation of Title 18, United States Code, Section 371.)

## COUNT TWO

1.    Paragraphs 1 through 9 of Count One of this Indictment are re-alleged as if fully set forth herein.

2.    On or about December 7, 2005, within the District of Columbia and elsewhere, defendants **MOJTADA MALEKI-GOMI**, **BABAK MALEKI**, and **SHAHRAM SETUDEH NEJAD** willfully exported and attempted to export 28 KDK machines from the United States to

Iran, via the United Arab Emirates, without first having obtained the required authorization from the United States Department of the Treasury's Office of Foreign Assets Control, located in the District of Columbia.

(**Violation of the United States Iranian Embargo**, in violation of Title 50, United States Code, Section 1705; Title 31, Code of Federal Regulations, Sections 560.203 and 560.204; **Aiding and Abetting and Causing an Act to Be Done**, in violation of Title 18, United States Code, Section 2)

## NOTICE OF FORFEITURE

1. Upon conviction of one or more of the offenses alleged in this Indictment the defendants, **MOJTADA MALEKI-GOMI, BABAK MALEKI**, and **SHAHRAM SETUDEH NEJAD** each shall forfeit to the United States, pursuant to 18 U.S.C. § 981(a)(1)(C) (as incorporated by 28 U.S.C. § 2461(c)), any property constituting or derived from proceeds obtained directly or indirectly as a result of the said violations, including, but not limited to, the following: **$28,000**, which represents a sum of money equal to the amount of money constituting, or derived from, proceeds obtained, directly or indirectly, as the result of the violation or conspiracy to violate Title 50, United States Code, Section 1705. If more than one defendant is convicted of an offense, the defendants so convicted are jointly and severally liable for the amount derived from such offense.

2. Pursuant to 21 U.S.C. § 853(p), as incorporated by Title 28, United States Code, Section 2461(c), each defendant shall forfeit substitute property, up to the value of the amount described above, if, by any act or omission of said defendant, the property identified above as subject to forfeiture

    a. cannot be located upon the exercise of due diligence;

      b.      has been transferred, sold to or deposited with a third party;

      c.      has been placed beyond the jurisdiction of the court;

      d.      has been substantially diminished in value; or

      e.      has been commingled with other property which cannot be divided without difficulty.

All in accordance with 28 U.S.C. § 2461(c) (incorporating 18 U.S.C. § 981(a)(1)) and Rule 32.2(a), Federal Rules of Criminal Procedure).

**(Criminal Forfeiture** pursuant to Title 18, United States Code, Section 981;Title 28 United States Code, Section 2461, and Rule 32.2a, Federal Rules of Criminal Procedure)

A TRUE BILL

FOREPERSON

Attorney of the United States in
and for the District of Columbia